UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MUJAHID FARID,

                                Plaintiff,                     01 Civ. 8292 (PKC)

             -against-

                                            MEMORANDUM
                                            <u>AND ORDER</u>

DR. I. ELLEN, GLENN S. GOORD, Commissioner of
the NYS Department of Correctional services,
LAWRENCE JONES, s/h/a/ L. JONES, a Lieutenant at
Woodbourne Correctional Facility, JOHN P. KEANE,
Superintendent of the Woodbourne Correctional
Facility, JOHN MITCHELL, Nurse Administrator at
Clinton Correctional Facility, DONALD SELSKY,
Director of Special Housing Units, DANIEL
SENKOWSKI, Superintendent of Clinton Correctional
Facility, and DR. LESTER WRIGHT, Deputy
Commissioner of NYS Department of Correctional
Services, Individually and in their Official Capacities,

                               Defendants.
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

                      Plaintiff Mujahid Farid, suing under 42 U.S.C. § 1983, alleges that he was

deprived of rights protected by the First Amendment to the U.S. Constitution when he was

disciplined by state prison officials at the Woodborne Correctional Facility ("WCF") for

possessing and distributing a booklet, "The Politics of Parole," of which he was the principal

author.  This Court concludes that the catch-all contraband rule, Rule 113.23, and the anti-

smuggling rule, Rule 114.10, pursuant to which discipline was imposed, were unconstitutionally

vague as applied to his actions.[1]  A permanent injunction will be entered ordering defendant

---

[1] The "Institutional Rules of Conduct" which are part B of the "Standards of Inmate Behavior" are found at 7
N.Y.C.R.R. § 270.2.

Goord to reinstate plaintiff's lost good-time credit and strike the finding of a violation from his disciplinary record.  The Court grants defendants' motion for summary judgment on grounds of qualified immunity, which precludes any award of monetary relief.

I.  Procedural Background

   This action was commenced on September 5, 2001 and reassigned to the undersigned on December 2, 2003.  Plaintiff asserted six claims for relief: first, Due Process and state law violations based on the filing and conduct of a disciplinary hearing (Compl. ¶ 99); second, a First Amendment violation based upon disciplinary violations against him for conduct which he alleged was constitutionally-protected (Compl. ¶ 101); third, constitutional and state law violations based upon alleged seizure of his documents (Compl. ¶ 103); fourth, constitutional violations arising out of his transfer amid a course of medical treatment (Compl. ¶ 105); fifth, constitutional and state law violations arising out of the alleged deprivation of "follow-up medical treatment" (Compl. ¶ 107); and, sixth, constitutional violations arising out of the alleged transfer of plaintiff that disrupted a scheduled trial (Compl.¶ 109).

   This Court dismissed the third and sixth claims without prejudice for failure to exhaust available administrative remedies, as required by the Prison Litigation Reform Act of 1995 (the "PLRA"), 42 U.S.C. § 1997e(a).  Farid v. Ellen, 2003 WL 23018805 (S.D.N.Y. Dec 23, 2003)(Farid I).[2]  After the close of discovery, the Court granted defendants' motion for summary judgment (and denied plaintiff's cross-motion) on the first, fourth and fifth claims because, in opposition to the defendants' motion, plaintiff had failed to come forward with evidence from which a reasonable jury could find in his favor on those claims.  Farid v. Ellen, 2006 WL 59517 (S.D.N.Y. Jan 11, 2006) ("Farid II").

---

[2] In an Order dated April 24, 2004, I denied plaintiff's motion, pursuant to Rule 60(b), Fed. R. Civ. P., which sought to reinstate the third and sixth claims.

In <u>Farid II</u>, this Court denied summary judgment as to plaintiff's First Amendment claim without prejudice to the right of either party to move on more fully developed briefing. This Court remarked that "[t]he briefs submitted by the parties have left many questions unanswered" as to this claim and urged the plaintiff to "explain precisely what speech or conduct he argues was constitutionally protected and precisely what adverse action he suffered." 2006 WL 59517 at *8. Defendants were directed to address <u>Shakur v. Selsky</u>, 391 F.3d 106, 113 (2d Cir. 2004). <u>Id</u>.

Following <u>Farid II</u>, plaintiff endeavored to take an interlocutory appeal to the Second Circuit. The appeal was dismissed and a mandate issued. (Doc # 93) Thereafter, defendants again moved for summary judgment on the First Amendment claim. In an Order filed on July 26, 2007 (Doc # 98), I invited the parties to submit further argument on the vagueness-as-applied issue.

<u>Summary Judgment Standard</u>

The standards governing a motion for summary judgment are addressed in <u>Farid II</u> and will not be repeated here. 2006 WL 59517 at *4. In connection with the renewed motion for summary judgment, defendants served plaintiff with the notice to pro se litigants, required by Local Rule 56.2, which explains the nature of a summary judgment motion and the actions a party must take to oppose such a motion. (Doc # 89)

A motion for summary judgment searches the record and, if there is no genuine dispute over a material fact and the non-movant is entitled to judgment in his favor, then summary judgment may be awarded to the non-movant. <u>See</u> <u>New England Health Care Employees Union, Dist. 1199, SEIU AFL-CIO v. Mount Sinai Hosp.</u>, 65 F.3d 1024, 1030 (2d Cir. 1995). "Care should, of course, be taken by the district court to determine that the party

against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law."  6 J.W. Moore, <u>Moore's Federal Practice</u> ¶ 56.12, at 56-165 (2d ed. 1995) (quoted with approval in <u>Ramsey v. Coughlin</u>, 94 F.3d 71, 73 -74 (2d Cir. 1996)).

In this case it is appropriate for this Court to consider summary judgment in favor of the non-movant.  The plaintiff did, indeed, move for summary judgment on the second claim for relief (Doc # 70, 72); that motion was fully briefed and decided in <u>Farid II</u> with the denial of each side's summary judgment motions.  In responding to plaintiff's earlier motion, defendants did not assert that they had been deprived of a full and fair opportunity to develop the factual record or that there were reasons why they could not then oppose the motion. Rule 56(f), Fed. R. Civ. P.  Defendants treat their present motion for summary judgment as if it were a continuation of their prior motion describing it as a "supplemental" motion.  They characterize the Court's ruling in <u>Farid II</u> as "deferring final ruling on the parties summary judgment motions regarding plaintiff's First Amendment claim . . . ." (D. Mem at 3)  Putting aside whether that characterization is apt, defendants view the plaintiff's summary judgment motion on the second claim for relief as if it were still pending.

Finally, the facts supporting plaintiff's First Amendment claim are not disputed by either side.  The disciplinary charges against the plaintiff, the by-laws of the voluntary organization of which he was a member, the booklet which assertedly was "contraband" and was "smuggle[d]" or an attempt was made to "smuggle" are all part of the record before this Court. The basis for imposing discipline is set out in a transcription of the disciplinary hearing.

II.  <u>The Facts</u>

From December 1997 to June 2000, plaintiff was incarcerated at WCF, a state prison in Woodbourne, New York.  (Farid Dep. at 40)  During this period, plaintiff was a member of an inmate organization known as the Long Termers Committee ("LTC").  (Farid Aff't ¶ 20)  The New York Department of Corrections ("DOCS") recognized and approved the existence of this organization.  (Farid Aff't ¶ 19)

Prison officials regulate group and organizational activities.  Thus, inmates are not permitted to engage or encourage others to engage in unauthorized organizational activities or meetings or possession or distribution of unauthorized materials.  DOCS Institutional Rule of Conduct 105.12 provides that:

> An inmate shall not engage or encourage others to engage . . . . in unauthorized organization activities or meetings, or . . . possess, distribute or use unauthorized organizational . . . materials.  An unauthorized organization is any gang or any organization which has not been approved by the deputy commissioner for program services.

On or about April 7, 2000, while plaintiff was at his work assignment, corrections officers at WCF searched his cell and confiscated written materials belonging to Farid.  (Farid Aff't, Nov. 26, 2006 at ¶ 8-9)  Among the papers seized and confiscated were "2 envelopes of papers and approx[imately] 150 pages of parole related articles".  Also confiscated from his person were 7 copies of a booklet entitled "The Politics of Parole – An Analysis by The Woodbourne Long Termers" which criticized parole policies and practices and contained profiles of nine prisoners, including plaintiff.  (<u>Id</u>. at ¶ 10)  Other seized materials were "multiple letters to civilians explaining [the] book[let] and its distribution, envelopes addressed to civilians that coincide with letters [and a] list of addresses that correspond to envelopes and letters." (<u>Id</u>.)

The 21-page booklet (excluding appendix) is dated April 2000 and lists the WCF address of the LTC on its cover page.  The booklet has the appearance of a professionally formatted document.  It features a table of contents, justified margins, bullet points, a graphic of the scales of justice and other small graphic art touches.  As to substance, it asserts, among other things, as follows:

- ". . . the present Parole Board is prone to corruption, political influence and conducts its business in an arbitrary and capricious manner as to be infirm, unequal and discriminatory. . . ." (p. 19)

- "The weight of the injustice of the criminal justice system falls disproportionately on communities of color." (p. 18)

- "Sure, [the Governor's] agenda sounds good, is easy to sell and sells well, but it is cruel and repressive against those who should have a chance at redemption." (p. 15)

- "Long Termers are proof positive that rehabilitation is possible in prison." (p. 21)

- Ways to help include "Register to Vote" and "Contact representatives in your area . . . ."  (p. 20)

At his deposition, Farid acknowledged that he was the principal author of "The Politics of Parole" and that he created it "working with" the LTC.  (Farid Dep. at 47-48)  He accepts the characterization of the work as having been prepared by the LTC.  (Id. at 48)  Farid further acknowledged that the work was not "authorized" by DOCS. (Id.)

On April 8, 2000, plaintiff received an Inmate Misbehavior Report ("IMR") alleging that plaintiff had committed several disciplinary violations by possessing, without

authorization, copies of the booklet, letters and envelopes.  (Farid Aff't ¶¶ 8-9; Def. Ex. B at 1, 24)  Specifically, Farid was charged with seven violations based upon the foregoing seized materials:  (1) unauthorized organizational materials in violation of Rule 103.12; (2) possession of "The Politics of Parole" and associated items which were assertedly "contraband"  under the catch-all provision, Rule 113.23; (3) smuggling or attempting to smuggle in violation of Rule 114.10; (4) unauthorized legal assistance in violation of Rule 103.20; (5) soliciting foods or services in violation of Rule 103.20; and (6) violation of Rule 180.11 which provides that "[a]n inmate shall comply with and follow the guidelines and instructions given by staff regarding facility correspondence procedures . . . ."

Then Deputy Superintendent of Administration Thomas Miller, a defendant in this action, presided at the April 12, 2000 disciplinary hearing on the charges set forth in the April 8, 2000 IMR.  (Farid Aff't ¶¶ 5, 15; Def. Ex. C at 41)  Plaintiff was provided with an opportunity to choose an individual to assist him in the hearing, and he chose Corrections Counselor Charles Davis, a non-defendant.  (Farid Aff't ¶ 5; Def. Ex. C at 42)

Shortly after the hearing began, plaintiff requested that defendant Miller disqualify himself from presiding at the hearing.  (Farid Aff't ¶ 16; Def. Ex. C at 44-45)  Plaintiff argued that, because Miller worked for the Superintendent of the Facility, John P. Keane, also a defendant in the action, he could not conduct the disciplinary hearing in a fair and neutral manner.  (Farid Aff't ¶ 16; Def. Ex. C at 44-45)  Plaintiff further asserted that Keane had targeted him because he had invited state legislators to visit the prison the previous August.  (Farid Aff't ¶¶ 13-14; Farid Dep. at 97, 101-09; Pl. Ex. 3)  Miller denied plaintiff's request, stating that Keane had never directed Miller to target plaintiff in any such manner.  (Farid Aff't ¶ 17; Def. Ex. C at 46-47)

At the hearing, Lieutenant Lawrence Jones, a defendant in this action, testified that another officer had found the booklet in an inmate's cell on a previous day and that Jones had checked with the staff advisor to the LTC and the deputy superintendent and determined that it had not been authorized and so he "instituted an investigation to determine who was making the pamphlet . . . ."(Nowve Decl., Mar. 22, 2005 at Ex. C, p. 73)

At the conclusion of the hearing on April 13, Miller found plaintiff guilty of the possession of contraband, soliciting goods or services and smuggling. (Nowve Decl., Mar. 22, 2005, Ex. B at 35; Ex. C at 77-78)  Miller found Farid not guilty of all other offenses.  (Id.) Miller imposed sanctions against Farid of confinement for ninety days in the Special Housing Unit ("SHU"), a loss of ninety days of various privileges – packages, commissary, special events and phones – and a loss of three months of "good time" credit.  (Farid Aff't ¶ 5; Nowve Decl., Mar. 22, 2005, Ex. B at 35)  Plaintiff's disciplinary history indicates that he served the SHU portion of the punishment between April 7, 2000, and July 6, 2000.  (Nowve Decl., Mar. 22, 2005, Ex. E)

In June of 2000, plaintiff appealed the disciplinary findings to defendant Glenn Goord, the DOCS Commissioner.  (Farid Aff't ¶ 35; Nowve Decl., Mar. 22, 2005, Ex. B at 544-47)  Acting on behalf of defendant Goord, defendant Donald Selsky, the DOCS Director of SHUs, dismissed the charge of soliciting goods or services and otherwise allowed the disciplinary findings and punishments to stand.  (Farid Aff't ¶ 36; Nowve Decl., Mar. 22, 2005 at 550-51)  Thus, the disciplinary charges that were sustained and form the basis for the discipline imposed were violations of the rules governing "contraband" and "smuggling."

III.    First Amendment Challenge to the Prohibition on
        Contraband and Smuggling as Applied to Farid's
        Conduct in Relation To "The Politics Of Parole"

There is a threshold issue of whether the regulations which Farid was found to have violated were unconstitutionally vague as applied to the possession, distribution and mailing of "The Politics of Parole."  Before turning to the vagueness challenge, I will briefly review the general framework of a constitutional challenge to the application of a regulation to the conduct of an inmate in a state correctional facility.

In Shakur v. Selsky, 391 F.3d 106 (2d Cir. 2004), Rule 105.12, quoted above, formed the basis for a sustained disciplinary charge against the plaintiff because of his possession of books and political expressions of "New Afrikan political literature."  The Court reversed a dismissal of the complaint under 28 U.S.C. § 1915A.

The Shakur Court began its analysis by noting that "'[a] prison inmate . . . retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system . . . .'" Shakur, 391 F.3d at 113 (quoting Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995)).  "'The governing standard is one of reasonableness . . . .'"  Shakur, 391 F.3d at 113 (quoting Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990)).  "'[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" Shakur, 391 F.3d at 113 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).  "'The prisoner-plaintiff bears the burden of proving that [a] disputed regulation is unreasonable.'" Shakur, 391 F.3d at 113 (quoting Senkowski, 54 F.3d at 1054).

The Shakur Court reviewed the three-step analysis for measuring the reasonableness of a prison regulation outlined in Turner, 482 U.S. at 89-91.  First, the Court inquires "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective."  Thornburgh v.

<u>Abbott</u>, 490 U.S. 401, 414 (1989).  Second, the Court examines "whether there are alternative means of exercising the right that remain open to prison inmates."  <u>Id.</u> at 417 (citations and internal quotation marks omitted).  Third, the Court considers "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." <u>Id.</u> at 418.

The <u>Turner</u> three-part test is not readily applicable to this case because the rules that Farid was found to have violated do not, on their face, address the conduct in which he engaged.  True, restrictions on contraband and smuggling are reasonably related to legitimate penological interests in restricting materials entering or exiting a correctional facility.  The rules are facially neutral in the sense that they contain no viewpoint restriction.  But there is a serious question whether these particular rules give a person in Farid's position fair notice that the conduct in which he is about to engage is prohibited.

Farid challenges Rule 113.23, the contraband catch-all provision, as "[un]constitutionally vague" as applied to his actions. (Farid Aff't, Nov. 28, 2006 at ¶53.)  He complains that, because of a perceived violation of the by-laws, the prison officials deemed the otherwise proper materials to be contraband. (<u>Id</u>. at ¶50)   "[D]efendants could not find a single substantive rule to fit save for 113.23." (<u>Id</u>. at ¶52)  The by-laws, he notes, would not give one fair notice that a violation would give rise to a disciplinary charge, as distinguished from censure, suspension or expulsion from membership in the LTC, the express remedies provided for in the by-laws in the case of a violation.  The "smuggling" charge—the violation of Rule 114.10 was premised upon the status of the materials as "contraband."

The Second Circuit had occasion to decide a vagueness challenge to DOCS Rule 105.11 – the rule prohibiting unauthorized organizational activity – as applied to individual silent

prayer in a prison yard.  In <u>Chatin v. Goode</u>, 186 F. 3d 82, 88-89 (2d Cir. 1999), the Court

affirmed the district court's conclusions that the rule did not give a person of ordinary

intelligence a reasonable opportunity to know what is prohibited and gave unfettered discretion

to prison officials to decide what conduct violated the rule.

        <u>Chatin</u> notes that "[t]he degree of statutory vagueness that the Due Process Clause

will tolerate 'depends in part on the nature of the enactment at issue'." <u>Id</u>. at 86 (quoting

<u>Hoffman Estates v. Flipside</u>, 455 U.S. 489, 498 (1982)).  <u>Chatin</u> concludes that the penalties for

violation of the DOCS rule were "akin to criminal rather than civil penalties. . . ."  and, hence,

the rule is not entitled to "'greater tolerance'" on a vagueness challenge. <u>Chatin</u>, 186 F. 3d at 86.

"Vagueness is particularly problematic when it 'abuts upon sensitive areas of basic First

Amendment freedoms'." <u>Id</u>. (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 109 (1972)).

<u>Chatin</u> also took note that "while inmates 'do not shed all constitutional rights at the prison gates,

. . . [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges

and rights'." <u>Chatin</u>, 186 F. 3d at 87 (quoting <u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995)).

        <u>Chatin</u> approved the use of a two-prong test for determining if the prison rule is

unconstitutionally vague as applied:  ". . . a court must first determine whether the statute gives

the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then

consider whether the law provides explicit standards for those who apply it." <u>Id</u>. at 87 (citing

<u>United States v. Strauss</u>, 999 F.2d 692, 697 (2d Cir. 1993); <u>see also</u> <u>Grayned</u>, 408 U.S. at 109.

    A. <u>Notice of Prohibited Conduct</u>

        A rule prohibiting the introduction of certain items into a prison setting is

grounded in common sense.  Prison officials must have the power to regulate an inmate's

possessions lest all manner of disruptive and dangerous items circulate through the facility,

including shanks fashioned as weapons, hack saws, written escape plans, alcohol and narcotics.

Rules 113.10 through 113.22 and 113.24 through 113.29 expressly prohibit a broad array of

items, including poppy seeds, weapons, dangerous instruments, tools, excess clothing or

bedding, private information (e.g. address or social security number) of DOCS employees,

written descriptions of the facility, facility organizational charts, and information concerning the

criminal history of a fellow inmate.

Farid was charged with violating none of the foregoing contraband provisions.

He was charged with violating Rule 113.10, the catch-all contraband provision:

> In addition to those items of contraband specifically identified by
> this rule series, an inmate shall not possess any item unless it has been
> specifically authorized by the superintendent or designee, the rules of the
> department or the local rules of the facility.

The Rule, by its express terms is addressed to "possess[ion]" of an "item"  It is

not directed to organizational activity, distribution of materials within the prison facility or the

manner in which the mails are used.

The defendants' theory of violation is premised upon the assertion that any

transmittal of the booklet was "correspondence" sent in violation of the LTC by-laws.

Defendant Miller who presided at the hearing, asserted that had defendant complied with the by-

laws of LTC, "The Politics of Parole" would not have been contraband.  Miller opined that the

"content of the document [per se] is not the problem. It is the presentation of the document under

the [aegis] of this institution that is the problem. . . ." (<u>Id.</u> at 76)  He asserted that if Farid had

"written what is in here as your opinion to your friend, to the Governor, to a news[paper,] that

would not been . . . a question." (<u>Id.</u>)

Superintendent Keane in his testimony at the hearing was of the same view: "[t]he

inmates got a right to do that . . . but when you do it [as an] organization . . . that's a different

situation but an individual has a right to do that."  (Id. at 68)  Keane wrote of the incident to a representative of American Friends Service Committee that "[a]s an individual he can express his opinions with anyone he would like, but not representing a facility organization without proper approvals."  Keane also wrote in a memo dated April 19, 2000 to other senior staff with a subject line of "Muslim Organization/Long Termer's Organization":

> If they followed proper procedures the production of the booklet in question appears to be within the directives I am guided by.  Not following proper procedures resulted in it being contraband.

(Farid Aff't, Apr. 19, 2005, Exs. at 7)

I take the above-quoted statements of defendants Miller and Keane to mean that, had the reference to the LTC as sponsor been stricken from the text of "The Politics of Parole" and it had been presented as the sole work product of Farid, then it would not have been "contraband."  There was no contention at the hearing that the booklet—apart from the requirement of approval of correspondence contained in the LTC by-laws—violated the Rule 113.10 "contraband" prohibition because it was not "specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility."

The by-laws of the LTC require each member to receive and become familiar with their contents. (LTC By laws §§ 1.01, 1.02, 1.03, Farid Aff't, Apr. 19, 2005 at Exs. p. 8)  It expressly provides that "[a]ll correspondence . . .  must be reviewed and approved by the staff advisor." (Id. at § 3.02)  All communications with the staff advisor are to be made through the Chairman of the LTC. (Id. at § 3.01)

The defendants assert that the booklet as distributed or mailed to anyone was "correspondence . . . [that] must be reviewed by the staff advisor" and in the absence of such

approval became "contraband".[3]  Section 11.02 of the by-laws provides that "[a] member determined to have violated a provision of the Constitution, By-laws or facility or departmental policies and procedures may, after being afforded an opportunity to be heard and to present his views, be sanctioned in accordance with this section."  Sanctions include censure, suspension or expulsion. (Id. at § 11.01(a)-(c))

A person of ordinary intelligence would not have had a reasonable opportunity to know that a violation of the LTC by-laws rendered a document contraband or otherwise constituted a violation of DOCS rules.  The defendants do not cite to any policy or practice, whether formal or informal, of deeming violations of by-laws to be violations of the disciplinary rules.

Conceivably, an LTC member's actions could violate the LTC by-laws and also violate a disciplinary rule.  But there was no notice that conduct that was not on its face a violation of a disciplinary rule would become punishable as such because it was prohibited by the LTC by-laws.  The LTC by-laws bear no resemblance to the explanatory directive issued by the Department of Defense on the day a statute prohibiting "sexually explicit materials" became effective, which defined some statutory terms and saved the statutory ban from a vagueness challenge.  General Media Communication, Inc. v. Cohen, 131 F.3d 273 (2d Cir. 1997).  I note that the application of the DOCS rule challenged in Chatin was not saved by reference to a DOCS Directive 4202 and a July 1995 Memorandum citing to the Directive.  While the Court found the Directive and Memorandum less than clear, it also noted that neither was issued contemporaneously with the rule (as had been the case in General Media), neither purported to define terms in the rule but each purported to prohibit conduct not explicitly prohibited by the

_____

[3] I find it unnecessary to reach the following neat question: if "The Politics of Parole" –without approval of the staff advisor to the LTC was "contraband"—would creation and possession of the booklet for the purpose of submitting it to the staff advisor still have been "contraband"?

rule. <u>Chatin</u>, 186 F.3d. at 88-89.  Here, the LTC by-laws and the contraband rule give no fair

warning that they are to be read in tandem.

    The respondents fair no better by trying to link possession and distribution of the

booklet to an earlier warning by the Superintendent to the LTC that members of the outside

community may not be invited to the prison without advance notice and permission. (<u>See</u> Nowve

Letter of August 14, 2007)  Respondents now rely on a letter dated April 6, 2000, purportedly

signed by Farid; it was submitted to the Court for the first time on August 14, 2007, long after

the record was closed on the successive rounds of summary judgment submissions. (Enclosure to

Nowve Letter of August 14, 2007)  I decline to consider this belatedly submitted and

unauthenticated letter on this motion.  But, were I to consider it, respondents would fair no

better.  Farid's letter states that he "submitted your [the addressee's] name for the invitation list

to the Long Termers Committee annual 'banquet' scheduled for this June.  You should have

received the informal invitation from one of our committeemen."  First, the letter is not an

invitation but an indication that an invitation had been sent by others.  The specific date of the

event is not mentioned, although it is clear that the event will be held on a Thursday in June.

There is nothing in this record—even if the April 6, 2000 letter were to be considered—

addressing whether the LTC, itself, had followed proper procedures with regard to the June

event.  Second, Farid was disciplined for the possession and distribution of the "Politics of

Parole" and not for unauthorized invitations to visit the facility. True, the same letter that refers

to the June event refers to the enclosure of the booklet which he was transmitting "for your

perusal and comments."  The mention of both subjects in the same letter is of no material

significance.

The "smuggling" prohibition as applied to Farid's action, also suffers from a lack of notice. Rule 114.10 provides that "[a]n inmate shall not smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another." The IMR, the charging document, asserts that "Inmate Farid was attempting to smuggle out disguised as legal mail." (Nowve Decl., Mar. 22, 2005, Ex. B at 43) But no evidence was offered at the hearing to support the allegation of a misuse of the "legal mail" designation. Farid was charged with, but found not guilty of, a violation of Rule 180.11 which provides that "[a]n inmate shall comply with and follow the guidelines and instructions given by staff regarding facility correspondence procedures . . . ." One is left to guess what conduct in connection with mailings of "The Politics of Parole" would have violated Rule 114.10 but not Rule 180.11.

The fact-finder, defendant Miller, described the conduct which he believed formed the basis of the charge of violating Rule 114.10: "[i]n terms of smuggling, you sent out copies of the unauthorized document from the facility." Id. at 51. The lack of authorization again stems from a lack of compliance with the LTC by-laws.

A person of ordinary intelligence would not have had a reasonable opportunity to know that mailing or attempting to mail "The Politics of Parole" was a violation of Rule 114.10 because the booklet violated the LTC by-laws which, in the view of prison officials, rendered it contraband.

B. Explicit Standards

A statute or regulation may also be unconstitutionally vague as applied when it "fails to provide sufficiently explicit standards for those who apply it when it 'impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis.'" Chatin, 186 F.3d at 89 (quoting Grayned, 408 U.S. at 108-09). Here, the

application of the contraband and anti-smuggling rules contained no explicit standards and placed unfettered discretion in the hands of the prison staff insofar as the rules were applied to written materials.

Defendants Miller and Keane have framed the issues, not in terms of the viewpoint of the booklet, but on whether the staff advisor's approval was obtained, approval which Keane predicted would have been granted had it been sought. (Farid Aff't, Apr. 19, 2005, Exs. at 7)  But their version of how the seizure of the "contraband" came about does not square with the account of those who participated in the seizure.

Retired Lieutenant Jones, as "Acting Captain," was the individual who ordered a search of Farid's cell and caused charges to be filed against him. (Nowve Decl., May 16, 2006, Ex. B, Jones at Q.5)  He makes it plain that the viewpoint expressed in "The Politics of Parole" influenced him to file charges:

> I determined that a threat to the secure order of the running of the facility did exist because of the sensitive nature of the materials confiscated. The continued distribution of this material could have become inflammatory within the prison population. This was not the purpose of the Lifers Group.

(Nowve Decl., May 16, 2006, Ex. B, Jones, Q.10)

I conclude on this record that Rules 113.23 and 114.10, as they were applied to Farid, did not contain explicit standards and gave prison officers unfettered discretion in interpreting what conduct is prohibited.  That unfettered discretion impermissibly permitted the viewpoint expressed by the inmate to enter into an evaluation of whether the conduct was violative of the rules.

## IV.  Qualified Immunity

Each of the defendants, who are present or former prison officials, assert that they are entitled to qualified immunity as to claims against them for money damages.  The principles

governing a motion for summary judgment on the grounds of qualified immunity in the First Amendment arena have been previously outlined by this Court.  See Zieper v. Metzinger, 392 F.Supp.2d 516 (S.D.N.Y. 2005), aff'd, 474 F.3d 60 (2d Cir. 2007).

Qualified immunity protects government officials "from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982)).  The defense shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818.  "While government officials are presumed to have a general knowledge of constitutional standards, they are clearly not required to anticipate 'the manner in which the law's grey areas will be clarified and defined.'" Gill v. DeFrank, 2000 WL 897152, *2 (S.D.N.Y. Jul. 6, 2000) (citations omitted), aff'd mem., 8 Fed. Appx. 35 (2d Cir. 2001); accord Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines'")(citation omitted), aff'd, 526 U.S. 603 (1999).  Immunity applies to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Defendants would be entitled to judgment in their favor on the issue of qualified immunity if the right violated were not clearly established at the time of the alleged violation, or there is no genuine dispute of material fact as to "whether . . . a reasonable police officer should have known he acted unlawfully . . . ." Lennon, 66 F.3d at 421; see also Hope v. Pelzer, 536 U.S. 730, 739 (2002); Wilson v. Layne, 526 U.S. 603, 614-15 (1999).  If reasonable officials in

defendants' positions could disagree as to whether defendants' disciplinary actions against plaintiff were unlawful, summary judgment on the issue of qualified immunity is appropriate. Lennon, 66 F.3d at 421.

The inquiry into whether a right is clearly established must be made "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; see also Anderson v. Creighton, 483 U.S. 635, 639-41 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. This does not mean, however, that an official will be protected by qualified immunity unless the very act in question has previously been held unlawful. Id. The unlawfulness must be apparent in light of pre-existing law. Id.

Here, one could frame the right as a right to be free from the unconstitutionally vague application of prison rules. Framing the right in that fashion would be too broad. Defining the right in terms of the specific rules and the booklet at issue would be too narrow. I conclude that an appropriately tailored formulation would be the right not to be punished for possession or distribution of a written expression of ideas pursuant to prison rules that do not give notice of the basis by which the written expression would be determined to be improper to possess or distribute.

Despite the size of the prison population and the frequency of prisoner suits, successful vague-as-applied challenges to prison regulations are relatively rare in the reported jurisprudence of the Supreme Court and the Second Circuit. Chatin addressed the vagueness of the unauthorized organizational activity rule as applied to the physical actions of inmates – silent prayer. Here, different prison rules are at issue and the nature of the conduct included the implied representation in the written materials that an officially approved organization of inmates

had been given institutional permission to transmit the materials.  While a lawyer might extrapolate from the principles in the vague-as-applied jurisprudence to the result here, the "contours of the right" are not so "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Anderson</u>, 483 U.S. at 640.  Thus, the qualified immunity defense is available, as a matter of law, to all defendants because the right was not clearly established.

But, even if this Court assumed that the right was clearly established, the defendants would be entitled nevertheless to summary judgment on qualified immunity. A government official's actions are objectively unreasonable "when no officer of reasonable competence could have made the same choice in similar circumstances."  <u>Lennon</u>, 66 F.3d at 420-21 (citing <u>Malley</u>, 475 U.S. at 341).  As long as a reasonable official could believe that what he is doing does not violate an established right, qualified immunity protects him from suit. <u>Anderson</u>, 483 U.S. at 638 (qualified immunity "shield[s] [defendants] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"); <u>Malley</u>, 475 U.S. at 341 ("If officers of reasonable competence could disagree on [whether their conduct was illegal], immunity should be recognized."); <u>Hope</u>, 536 U.S. at 739.

"The question of reasonable disagreement turns on whether reasonable officers could disagree about <u>whether</u> [their] conduct is illegal, not on whether they know the precise constitutional reason <u>why</u> it is not lawful." <u>Russo v. City of Bridgeport</u>, 479 F.3d 196, 212 (2d Cir. 2007) (emphasis in the original)  "[I]n ascertaining whether the right was clearly established with respect to a given situation, a court must consider 'not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the government actor's] position

should know' about the appropriateness of his conduct under federal law." Johnson v. Newburgh

Enlarged School Dist., 239 F.3d 246, 251 (2d Cir. 2001)(quoting Young v. County of Fulton,

160 F.3d 899, 903 (2d Cir. 1998)).

   A reasonable prison official would have known at the time of Farid's disciplinary

hearing in April 2000 that a ban on inmate-to-inmate solicitations for membership in a union of

prisoners was lawful. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119

(1977). He would know that a ban on correspondence between non-family member inmates at

different institutions was also lawful. See Turner, 428 U.S. at 91. A reasonable DOCS official

would further know that Rule 105.12 was found to be unconstitutionally vague as applied to

silent prayer in a prison yard. See Chatin, 186 F.3d at 89. But, in the absence of controlling

precedent to the contrary, a reasonable prison official could have considered the LTC by-law

requiring staff approval of correspondence from the LTC to have been sufficient notice of

prohibited conduct to save Rules 113.23 and 114.10 from a vagueness challenge.

   "[S]ummary judgment on qualified immunity grounds is not appropriate when

there are facts in dispute that are material to a determination of reasonableness, . . . ." Kerman v.

City of New York, 261 F.3d 229, 240 (2d Cir. 2001) (citation omitted). But, where there is no

genuine dispute of material fact, "the ultimate legal determination whether . . . a reasonable

police officer should have known he acted unlawfully is a question of law better left for the court

to decide," Lennon, 66 F.3d at 421. The Second Circuit has "recognize[d] the apparent

anomaly" this creates:

> After all, Rule 56(c) of the Federal Rules of Civil Procedure provides
> that summary judgment shall be entered only when a review of the entire
> record demonstrates that there is no genuine issue as to any material fact.
> Disputes over reasonableness are usually fact questions for juries. However,
> in qualified immunity cases, a Court is not concerned with the correctness of
> the defendants' conduct, but rather the "objective reasonableness" of their

> chosen course of action—whether reasonable officers could disagree about the
> lawfulness of the conduct.

Id.

See Cohen v. San Bernardino Valley College, 92 F.3d 968 (9th Cir. 1996) (upon

de novo review, qualified immunity defense available as to defendants who enforced a vague-as-

applied sexual harassment policy); Wolfel v. Morris, 972 F.2d 712, 720 (6th Cir. 1992) ("The

fact that these regulations were subsequently held unconstitutionally vague as applied in a court

case addressing a fairly complex legal matter cannot serve to strip these individuals of their

immunity from individual liability when reasonably performing discretionary official

functions."). But see Newell v. Sauser, 79 F.3d 115 (9th Cir. 1996) (affirming interlocutory

ruling by district court that defendants, prison officials, were not entitled to qualified immunity

as to a vague-as-applied regulation where the prison officials promulgated a more specific

regulation three weeks after the incident, thereby suggesting that they knew that the regulation at

issue was vague).

All defendants are entitled to summary judgment on the defense of qualified

immunity because the right was not clearly established.  Alternatively, and assuming, arguendo,

that the right was clearly established, summary judgment in favor of defendants would be proper

because reasonable prison officials could have disagreed as to whether the right would be

violated by their actions.

Defendant Goord is the Commissioner of DOCS is entitled to summary judgment

for an additional reason. "It is well settled in this Circuit that personal involvement of defendants

in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."

Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501

(2d Cir. 1994)).  "The personal involvement of a supervisor may be established by showing that

he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated." Iqbal v. Hasty, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

The Second Circuit has noted that the lack of personal involvement may also be "relevant to a defense of qualified immunity because it goes to the question of whether a defendant's action violated a clearly established right." Iqbal, 490 F.3d at 153.  Here, there is no evidence that Goord directly participated in the violation or failed to remedy the violation after personally being informed of it.  He may have had a role in the drafting or approval of the two rules at issue; however, it is not the rules, themselves, but their application to these facts, that gives rise to the constitutional violation.  There is no evidence that he was grossly negligent in his supervision of subordinates or was deliberately indifferent to the rights of Farid or others similarly situated.  Thus, none of the factors outlined in Colon v. Coughlin are satisfied and summary judgment is granted to Goord for lack of personal involvement and on the defense of qualified immunity.

V.  Relief

"Qualified immunity shields public officials from money damages only." Morse v. Frederick,  ___U.S.___, 127 S.Ct. 2618, 2621-22 (June 25, 2007) (citing Wood v. Strickland, 420 U.S. 308, 314, n.6 (1975)).  Thus, the availability of the defense to all defendants does not preclude declaratory or injunctive relief. See Hewitt v. Helms, 482 U.S. 755, 766 (1987) (citing

Pulliam v. Allen, 466 U.S. 522, 543-544 (1984)).  See also Huminski v. Corsones, 396 F.3d 53, 89 (2d Cir. 2005).

Plaintiff's pro se complaint seeks declaratory relief but is silent as to injunctive relief.  It does seek "such other and further relief as this court deems is [sic] entitled to plaintiff." The relief sought is broad enough to include meaningful injunctive relief in this case.

This Court declares Rules 113.23 and 114.10 unconstitutionally vague as applied to Farid's possession and mailing of materials in violation of the by-laws of the LTC.  There is no showing that the correctional facility would not give full effect to such declaratory relief and, thus, on this record, there is no need for injunctive relief as to future violations.  An award of injunctive relief is granted insofar as defendant Goord is ordered to strike from Farid's records the finding that he violated Rules 113.23 and 114.10 and to restore to him the three months of "good time" credit which he lost.

VI.  Conclusion

Organized activities by groups of prisoners pose special dangers to the operation of a facility.  Prison officials face a difficult challenge and the failure to control the conduct of prisoners may have dire consequences to correctional officers and other inmates.  In Turner, Justice O'Connor, writing for the Court observed that:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in Martinez, additional reason to accord deference to the appropriate prison authorities.

482 U.S. at 84-85 (quoting Procunier v. Martinez, 416 U.S. 396 (1974)).

Deference and restraint cause this Court to note that its ruling is not intended to address whether a charge against Farid could have been sustained for a violation of Rule 105.12 which, as noted, provides that "[a]n inmate shall not engage or encourage others to . . . possess, distribute or use unauthorized organizational . . . materials." It suffices to note that Farid was found not guilty of that charge. (Nowve Decl., Mar. 22, 2005, Ex. B at 35; Ex. C at 77) Nor does this Court address whether DOCS could have drafted a viewpoint neutral rule addressing the circumstances in which an inmate may produce and distribute materials which provided adequate advance notice of the prohibited conduct and did not give unfettered interpretive discretion to prison staff. That said, Rules 113.23 and 114.10 were unconstitutionally vague as applied to Farid's conduct.

Plaintiff is granted summary judgment insofar as the Court declares that Rules 113.23 and 114.10 are unconstitutionally vague as applied to plaintiff's possession and mailing of the written expression of ideas in violation of the by-laws of the LTC and he is awarded a permanent injunction striking from his disciplinary history the finding of a violation of those rules and restoring to him the three months of good time credit he lost. Defendants' motion for summary judgment is granted insofar as the defendants are entitled to qualified immunity.

In view of the disposition of the pending motion addressed to the second claim for relief, and the rulings of this Court in Farid I (dismissing claims third and sixth) and Farid II (dismissing claims first, fourth and fifth), final judgment should be entered by the Clerk.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 15, 2007